**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

RICK L. WELLENSTEIN,

             Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

             Defendant.

No. C08-4098-MWB

**REPORT AND RECOMMENDATION**

## *I. INTRODUCTION*

The plaintiff Rick L. Wellenstein seeks judicial review of a decision by an administrative law judge ("ALJ") denying his applications for disability insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the Act. Wellenstein claims the ALJ erred in the following respects: (1) failing to give proper weight to the opinions of his treating psychiatrist, (2) failing to properly consider the opinions of his treating therapist, (3) failing to fully and fairly develop the medical record, and (4) failing to make a proper credibility analysis. (*See* Doc. No. 10)

## *II. PROCEDURAL AND FACTUAL BACKGROUND*
### *A. Procedural Background*

Wellenstein claims he is disabled due to residual effects of a motorcycle accident, anxiety/depression, and a somatoform disorder. (Doc. No. 10, p. 3) On November 5, 2004, he filed applications for DI and SSI benefits, alleging a disability onset date of January 1, 2003. (R. 16; 65-67) His applications were denied initially (R. 43-47), and on reconsideration (R. 51-59).

He requested a hearing, and on April 3, 2007, a hearing was held before an Administrative Law Judge ("ALJ"). (R. 290-332) Wellenstein was represented at the

hearing by non-attorney Lee Sturgeon. Wellenstein testified at the hearing, as did Vocational Expert ("VE") Gail Leonhardt. On April 14, 2007, the ALJ found that although Wellenstein could not return to any of his past relevant work, he nevertheless retained the functional capacity to work and he therefore was not disabled. (R. 13-33)

Wellenstein appealed the ALJ's ruling, and on September 22, 2008, the Appeals Council denied his request for review (R. 6-8), making the ALJ's decision the final decision of the Commissioner.

Wellenstein filed a timely Complaint in this court seeking judicial review of the ALJ's ruling. (Doc. No. 1) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Wellenstein filed a brief supporting his claim on March 24, 2009. (Doc. No. 10) On May 21, 2009, the Commissioner filed a responsive brief. (Doc. No. 11) The case is now fully briefed, and the court turns to consideration of the issues.

## B. *Factual Background*

### 1. *Introductory facts and Wellenstein's hearing testimony*

Wellenstein was born in 1958. (R. 65) He claims he became disabled on January 1, 2003, when he was 44 years old. He lives in Whiting, Iowa, with his wife of many years. (R. 300-301, 314)

Wellenstein was in a motorcycle accident in 1979. Before the accident, he worked full time at a drain-cleaning company. (R. 316) After the accident, he attempted to return to his job, but he "simply could not do it." (R. 312) Since then, he has not held full-time employment. (*Id.*)

Wellenstein is a high school graduate. (R. 295) He has taken two vocational rehabilitation programs, the first one in plumbing and the second one in drafting, but he was unable to complete either program. (R. 295-96) After failing to complete the second

program, he spoke with a representative of the vocational rehabilitation program, who recommended that he find a full-time job. He did not take this advice. When the ALJ asked why, Wellenstein testified,

> A full-time job? To find a full-time job, that's not what I was interested in doing anyway. It wasn't my objective. I have a business where I work two hours right now, two to three hours. Why would I work full-time? I mean, there's – I'm not capable of doing it, #1, and #2, it's not necessary . . . [b]ecause I have a business that I work a minimal amount of hours and I'm able to survive with that.

(R. 298)

Wellenstein has operated a cleaning service for commercial property since at least January 1, 2003. He works at the business about three to four hours each week. He oversees operations and does some of the cleaning, including mopping floors and cleaning bathrooms, although most of the work is subcontracted out. His wife handles the books. (R. 299-300) The business has several large clients, such as Walgreens and FedEx.

Wellenstein testified that although he can run his business, he is not able to work at a full-time job. (R. 312-13) When asked if he could do a full-time "sitting down job," he responded, "I don't think so. I do a minimal amount of work as it is. The work that I do, I am capable of maintaining, with my wife's help, right now. . . . Why would I do a full-time [occupation] when I can get by on two to three hours of work right now?" (R. 311)

Wellenstein testified he has both physical and mental problems that prevent him from working full time. (R. 305-306) His mental problems include severe depression, an anxiety disorder, and a somatoform disorder. (R. 306) He believes his somatoform disorder is "anxiety-based." When he has a somatoform episode, it is similar to going into shock. He goes limp "like a rag doll" and loses his balance, and his speech becomes unintelligible. It causes him to overheat, perspire, and "get prickly all over." (*Id.*) Each episode usually last from four to six hours. When he has an episode, he has to remove

himself from his environment because it "renders [him] incapable of even doing anything." (R. 313)  He avoided questions about the frequency of these episodes (R. 306-308), but he testified he was having one during the ALJ hearing, though not a severe one.  He could tell he was having one because he started to overheat.  (R. 307)  He testified that if he is pushed while having an episode, the severity of the episode will increase.  (*Id.*)  He has never been hospitalized for one of these episodes (R. 308-309), although he has been to the emergency room on three occasions as a result of this problem.  (R. 313)

Wellenstein testified his depression can be so severe that it is immobilizing.  When suffering from depression, he can function only on "a very, very basic level."  He also has "visual phenomenon with it," which includes seeing spots, flashes of light, and auras.  He also has migraines.  (R. 312, 318)

When Wellenstein is not working, he spends much of his time sleeping.  (R. 309)  He watches birds, although he has stopped feeding them.  He listens to music.  He occasionally drives a car.  (R. 317-18)  He participates in church at a "very minimal level," but has little contact with friends or family.  (R. 316-17)

At the time of the ALJ hearing, Wellenstein was taking Lexapro and Wellbutrin for depression and anxiety; Provigil for fatigue; Protonix for inflammation from numerous injuries to his shoulder, hands, wrist, elbow, and back; and medication to prevent the Protonix from damaging his stomach.  (R. 311-12)

b.    *Wellenstein's medical history*

1.    *Treatment notes*

Most of the medical evidence of record relates to Wellenstein's mental health treatment.  Wellenstein was seen by Nurse-Practitioner Judy Buss at Siouxland Mental Health on January 4, 2002, for a formal intake evaluation.  (R. 215-17)  Wellenstein reported to Buss that his doctor had been treating him for seven years with various medications including Zoloft, Wellbutrin, Prozac, and Ritalin.  (R. 215)  He had been on

4

Prozac for a year, and stated it seemed to be helping him. He had quit his job one month earlier, but stated he did not know why he had quit. He stated he "does better in the summer months," and "gets overcome by life stresses." (*Id.*) He "becomes bored easily with details," and "has a tendency to hyper focus." (*Id.*) He indicated he did poorly in school and had been diagnosed with ADD, for which he had been taking Ritalin. (*Id.*) Buss noted Wellenstein's affect was appropriate, and he exhibited no unusual speech patterns, movements or behavior. (R. 216) Buss listed the following diagnostic impressions: "Depressive Disorder NOS," "Seasonal Affective Disorder," "Rule Out OCD," "ADD by History," and "ODD by History." (R. 217) She assessed his current GAF at 60. She recommending increasing his Prozac dosage to 40 mg daily, and restarting Wellbutrin SR 150 mg twice daily. (*Id.*)

Wellenstein returned for follow-up on February 14, 2002, with no change in condition. (R. 214) On February 28, 2002, he underwent an intake evaluation by counselor Verna Halligan. (R. 209-13) Wellenstein stated he was working as a janitor at Walgreens, a job he had been doing since 1983. He complained of problems getting to sleep and staying asleep. He was taking Wellbutrin, which he indicated caused problems with his concentration and memory. He was noted to be very talkative, and to intellectualize his problems. He indicated he had problems with relationships, and had lost all of his friends since his motorcycle accident in 1983. He "[a]ssumes other people see him as a 'bad' person." (R. 210) The counselor diagnosed Wellenstein with "Mood Disorder NOS," "Rule Out Seasonal Affective Disorder," "Personality change after brain injury," and problems relating to his siblings and friends. She assessed his current GAF at 50. Therapy goals were established including improvement of Wellenstein's relationship skills, "coping with PTSD, decreasing depression and anxiety." (R. 212-13)

Wellenstein saw Wade Kuehl, LMSW for counseling sessions on March 11 and 18, and April 1, 2002. (R. 206-08) He saw Ronald Brinck, M.D. for a "formal intake" and medication review on May 8, 2002. Dr. Brinck diagnosed Wellenstein with dysthymia,

"Rule Out Bipolar II Disorder," and a current GAF of 55. He continued Wellenstein on Wellbutrin, and began a trial of Trileptal. (R. 204-05)

Wellenstein cancelled his appointments on June 18 and December 17, 2002. He saw his family doctor on June 17, 2003, for follow-up of "anxiety, depression, and possible ADHD." (R. 183) He was doing fairly well, and was working five to six hours a week at his janitorial job. The doctor prescribed Lexapro and Ritalin. (*Id.*)

Wellenstein returned to see his family doctor on July 15, 2003. He was doing "fairly well" with his depression. He had been exercising and working on weight loss. He had stopped taking the Lexapro because it made him tired, and he was started on Wellbutrin. (R. 182-83)

Wellenstein saw Dawn Nolan, PA-C at Siouxland Mental Health on December 10, 2003, "for a follow up on his Dysthymia." (R. 201) He complained of "poor attention span and concentration," and stated he believed he had ADD/ADHD. He was started on Strattera, and scheduled for follow-up in one month. (*Id.*) When he returned on January 12, 2004, Wellenstein stated the Strattera had "improved his concentration and also his mood, but he had to stop it due to severe GI upset." (R. 200) He asked to be put back on Wellbutrin, which he had tolerated well. (*Id.*)

Wellenstein saw P.A. Nolan again on April 15, 2004. He stated his depression was well controlled on Wellbutrin, but he continued to complain of decreased energy. Provigil was added to his medication regimen. (R. 199)

Wellenstein returned to see his family doctor on May 18, 2004, asking about getting started on Ritalin again. His depression was under "fair to good control, with possible bipolar symptoms." (R. 182) He was given prescriptions for Ritalin, Methylphenidate (for ADD), and Adderall. (*Id.*)

Wellenstein saw P.A. Nolan at Siouxland Mental Health on August 12, 2004, and stated he had stopped taking the Provigil two months earlier, and had begun a trial of

Adderall through his family doctor. He found the Adderall helpful but could not afford it. He resumed Provigil and Strattera, and continued with Wellbutrin. (R. 198)

Wellenstein saw his family doctor again on October 20, 2004. He continued to do "pretty well with his depression." (R. 180) He complained of significant fatigue, and arthritis in his back. He was advised to increase his activity level, and develop a regular schedule. He was put back on Adderall, and the doctor suggested he take an aspirin and multivitamin daily. (*Id.*)

At his next appointment with P.A. Nolan, on December 1, 2004, Wellenstein reported doing fairly well. (R. 197)

Throughout his course of treatment at Siouxland Mental Health, Wellenstein continually reported problems with lack of energy, poor concentration, and incidents of obsessive behavior, such as turning his turn signals on repeatedly in the car, and getting ideas in his head that he could not let go. He stated other family members had dealt with similar symptoms. When he saw P.A. Nolan on January 27, 2005, he was agitated and fidgety. He was instructed to get a neurological exam and talk with his family doctor about hot flashes that he was experiencing. Risperdal was added to his medications. (R. 196)

He was seen again on March 14, 2005. He had stopped taking Risperdal after about one week because his symptoms improved. He indicated his "psychotic symptoms only happen[ed] during times of stress," and he preferred to try to avoid stressors rather than to keep taking Risperdal. He stated he would try the drug again if he was unable to control his stress. (R. 195)

Wellenstein saw P.A. Nolan again on April 18, 2005. Wellenstein talked "at length today about his distress due to his Vocational Rehab evaluation," stating he "had a lot of difficulty with the testing because he was hallucinating all the while, but his testing showed he was cognitively able to work." (R. 268) Wellenstein stated the evaluator had been "quite rude about the results," which caused him stress. He complained of visual

hallucinations or "floaters" in the form of "shadows or shapes." (*Id.*) His medications were continued without change, and P.A. Nolan noted she "provided supportive psychotherapy." (*Id.*)

On May 25, 2005, Wellenstein saw Gary Lewis, LISW for a counseling session. Wellenstein was noted to be "[m]ore anxious," and struggling with "his worries about his yet undiagnosed physcial [sic] problem." (R. 267) Wellenstein expressed concern about "his blackouts where he momentarily lose[s] perspective of time." (*Id.*) He was scheduled to return in one week. (*Id.*)

Wellenstein saw Lewis on June 1, 2005, stating he wanted "to express his feelings about [a] recent panic episode." (R. 266) Wellenstein stated he had experienced "sweaty palms, rapid pulse and heart beat 'for no apparent reason,'" as well as "blurred speech." (*Id.*) He had gone to the emergency room and been told he was having a panic attack. (*Id.*) Lewis scheduled him for follow-up in one week. (*Id.*) Wellenstein missed his scheduled appointment on June 13, 2005. (R. 265)

On June 21, 2005, Wellenstein saw Dr. Brinck "for a formal intake." (R. 263) Dr. Brinck diagnosed Wellenstein with Major Depressive Disorder, Generalized Anxiety Disorder, Rule Out OCD, and Rule Out Bipolar Disorder. He assessed Wellenstein's current GAF at 50. The doctor noted Wellenstein had only had "a limited response to multiple med trials which is not uncommon for this diagnosis," and Wellenstein's symptoms had been "quite limiting for many years and [had] prohibited him from employment." (R. 264) He recommended Wellenstein continue to participate in therapy, and he "encouraged [Wellenstein] to pursue Social Security Disability." (*Id.*)

Wellenstein saw Lewis on June 27, 2005, and stated he had been to the ER again for "another episode." (R. 262) According to Wellenstein, doctors had done an "EED and CAT scan," both of which were normal. He also reported having an MRI that was normal. Dr. Brinck had started him on a trial of Lexapro which Wellenstein said "left him feeling strange, but better than others he [had] tried." (*Id.*) He indicated he "needs to

learn how to live with it and thinks he can do that." (*Id.*) The therapist recommended some relaxation exercises. Notes indicate Wellenstein "does not take suggestions well – has some resistance to struggle with." (*Id.*)

Wellenstein saw another therapist, Terry Hey, on July 14, 2005. Wellenstein appeared anxious and he "complained of losing his sense of time," but the incidents he described were noted to be unremarkable and somewhat ordinary, such as losing track of what month it is or what time it is. (R. 261) Wellenstein "insisted that it all began with his last ER visit and has been getting worse." (*Id.*) He was scheduled for follow-up in one week. (*Id.*)

Wellenstein saw Hey on July 21, 2005. The therapist found Wellenstein to be "deluded about his own knowledge/abilities, avoidant, somewhat histrionic," and egocentric, "hiding an inferiority complex." (R. 258) He noted Wellenstein "seemed very vested in receiving a diagnosis of somataform [sic] disorder." (*Id.*) The therapist suggested Wellenstein had "many treatable symptoms and at this point the diagnosis itself wasn't as relevant as treating the immediate symptoms." (*Id.*)

Wellenstein also saw P.A. Nolan on July 21, 2005, for medication management. Wellenstein had stopped taking Lexapro after a short time "because it sedated him and he would just sit and stare at the ceiling." (R. 257) Dr. Brinck had suggested Klonopin, Xanax, or an antipsychotic, but Wellenstein stated he could not afford Klonopin or Xanax, and he "refuse[d] to consider an antipsychotic because of a reaction he had to Risperdal." (*Id.*) He indicated he had "fired his therapist because she was challenging him to look at things he didn't want to address." (*Id.*) P.A. Nolan suggested any good therapist would do the same, and she "encouraged him to reconsider the suggestions for a med change and therapy." (*Id.*)

Wellenstein saw a Verna Halligan on August 25, 2005. Halligan gave Wellenstein "handouts on stress management and on refuting irrational ideas." (R. 256) She attempted to discuss these with Wellenstein, but he stated he was skeptical that it could help him.

"States he is 'dancing with a gorilla', and states the gorilla is dysphoria, and it 'does more than just step on my feet'." (*Id.*)  Wellenstein reported he was taking his Lexapro, but only 1/4 pill instead of the 1/2 pill prescribed because he disliked the side effects.  (*Id.*)

At his next session, on September 21, 2005, Wellenstein stated his somatoform disorder had "changed his personality" and significantly altered his cognitive abilities.  He refused to schedule another session, stating he would call "if he decides therapy will be useful to him." (R. 254)

Wellenstein saw P.A. Nolan for medication management on November 2, 2005.  He reportedly was "doing about the same," but stated he continued to have "mini strokes that happen during times of increased stress." (R. 253)  Notes indicate Wellenstein "expresses concern over Dr. Brinck's diagnosis of Undifferentiated Somatoform Disorder, as . . . his attorney said that won't get him disability." (*Id.*)  His medications were continued without change, and he was directed to follow up in three months. (*Id.*)

Wellenstein returned to see P.A. Nolan on January 31, 2006.  He reported good sleep and appetite, and no side effects from his medications which included Lexapro, Provigil, and Wellbutrin. (R. 252)

On March 21, 2006, Wellenstein saw Dr. Brinck.  He was noted to be neatly groomed with normal speech, appropriate language, and clear thought content.  He also reported having good sleep and appetite, and no side effects from his medications.  His behavior was noted to be "psych retardation," with anxious and depressed mood and affect.  The doctor's diagnoses included Generalized Anxiety Disorder, Somatization Disorder, and Major Depressive Disorder, Rule Out OCD.  His current GAF was 40 to 45. (R. 251)

Wellenstein saw Dr. Brinck again on April 4, 2006, "with questions about disability." (R. 250)  He was anhedonic and reported suicidal thoughts with no plan.  Increased Wellbutrin had increased his energy slightly. (*Id.*)

On April 4, 2006, Dr. Brinck completed a Medical Source Statement form regarding Wellenstein. (R. 191-94) He indicated Wellenstein had been seen at the clinic for therapy and medication management since 2002. His diagnoses were Major Depressive Disorder, Generalized Anxiety Disorder, and Somatoform Disorder. Dr. Brinck indicated Wellenstein had improved only partially, and he continued "to struggle with depression, anhedonia, low energy, guilt, trouble thinking and concentrating, anxiety, and panic attacks," which symptoms "interfered with his ability to work or even perform all activities of daily living." (R. 192)

Dr. Brinck opined Wellenstein was markedly limited in his ability to maintain regular attendance and punctuality within customary tolerances; to complete a normal work day and work week without interruptions from psychologically-based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. He opined Wellenstein was seriously limited in his ability to sustain an ordinary routine without special supervision; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in a routine work setting. He opined Wellenstein was mildly limited in the ability to remember work-like procedures; to understand, remember, and carry out very short and simple instructions; to maintain attention for extended periods of two-hour segments; to work in coordination with or proximity to others without being unduly distracted by them; and to make simple work-related decisions. He opined Wellenstein would have no limitations in the ability to ask simple questions or request assistance, and to be aware of normal hazards and take appropriate precautions. (R. 191-92)

Dr. Brinck indicated Wellenstein exhibited symptoms including anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, motor

11

tension, autonomic hyperactivity, apprehensive expectation, vigilance and scanning; and recurrent severe panic attacks manifested by a sudden, unpredictable onset of intense apprehension, fear, terror, and a sense of impending doom occurring on the average of at least once a week. He opined Wellenstein's limitations were extreme in the areas of activities of daily living, difficulties in maintaining social functioning, and deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, in work settings or elsewhere. He further indicated Wellenstein experienced "continual" episodes of deterioration or decompensation. (R. 194)

Wellenstein saw P.A. Nolan for medication management on July 5, 2006. He had started taking blood pressure medication and had stopped taking Lexapro because the combination of the medications made him break out in a rash. He reported "his mood and anxiety [were] about the same and he wishe[d] he could take the Lexapro because it did help some." (R. 248) He appeared anxious and depressed. He was advised to see a therapist. (R. 249)

Wellenstein saw Diane Sorensen, LISW, for an intake assessment on July 11, 2006. (R. 244-46) Her treatment plan for Wellenstein was to "attempt cognitive redirection to influence symptoms." (R. 246) His first counseling session with Sorensen was on July 18, 2006. When asked what he was "moving toward," Wellenstein responded that "it dealt with an end to the disability process." (R. 243) He returned for follow-up on July 25, 2006. He completed a Burns Anxiety Inventory "which generated a score of 67, extremely anxious." (R. 242) Sorensen showed him a technique to help reframe his thoughts to be rational, but Wellenstein "appeared not particularly interested." Sorensen noted, "We are rather at a stalemate, as [Wellenstein] has been with therapists previously." (*Id.*)

Dr. Brinck saw Wellenstein on August 9, 2006. The doctor increased Wellenstein's Wellbutrin dosage. (R. 241) Wellentsein then saw Sorenson for a therapy session. Sorensen suggested his "thoughts and feelings [could] manifest as symptoms," and she

recommended a method to change his thinking. (R. 239) At their next session on August 16, 2006, Wellenstein described feeling "self-hypnotized," and stated he felt "incapable of physical activity because of physical/health restrictions, even fishing." (R. 238) Sorensen assigned homework, directing Wellenstein to try one new challenge. (*Id.*)

Wellenstein saw Sorensen on August 30 and September 27, 2006, and February 7, 2007. No real progress was noted. Wellenstein continued to relate a litany of physical problems that he correlated with his stress and anxiety. (R. 25-26, 234, 237)

On September 28, 2006, Dr. Brinck wrote a letter stating that "[d]espite numerous medication trials and ongoing psychotherapy, [Wellenstein] continues to have residual symptoms that clearly interfere with his ability to work." (R. 190) He indicated he had "strongly encouraged" Wellenstein to apply for disability benefits, and the doctor opined Wellenstein would be unable to "obtain or maintain gainful employment for the foreseeable future." (*Id.*)

On March 26, 2007, Diane Sorensen, LISW from Siouxland Mental Health completed a Medical Source Statement checklist regarding Wellenstein. She indicated Wellenstein would be seriously limited in his ability to maintain attention for extended periods of two-hour segments, maintain regular attendance and be punctual within customary tolerances, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and respond appropriately to changes in a routine work setting. She indicated he would be seriously or markedly limited in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 219-20) Ms. Sorensen listed Wellenstein's impairments as an Affective Disorder, with symptoms of anhedonia, decreased energy, difficulty concentrating or thinking, and thoughts of suicide; a possible Anxiety-Related Disorder

characterized by recurrent severe panic attacks; and a Somatoform Disorder, characterized by persistent nonorganic disturbances of the use of his limbs and diminished or heightened sensation, and unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that he has a serious disease or injury. (R. 222) Sorensen opined Wellenstein has a marked restriction of the activities of daily living, and marked deficiencies of concentration, persistence or pace that would result in failure to complete tasks in a timely manner. (R. 223)

### 2. *Consulting opinions*

On December 8, 2004, Wellenstein underwent a physical examination by RoseMary Mason, M.D. at the request of Disability Determination Services. (R. 184-88) Wellenstein stated he and his wife worked at Walgreens four hours per week, polishing the floors with a high speed burnisher. His wife did "all of the bending and lifting" while he "walk[ed] behind the self-assisted machine that more or less pull[ed] itself." (R. 184) He previously worked as a parking ramp attendant for ten hours per week, but he could not maintain the job because of physical pain, depression, and nervous anxiety. He reported taking Wellbutrin XL for depression, Provigil for fatigue, Strattera for obsessive compulsive and attention deficit disorder and to aid concentration, Ibuprofen for arthritic pain, and Glucosamine Chondroitin for arthritis. (R. 185)

Examination showed Wellenstein had normal ranges of motion in his shoulders, elbows, and wrists, and a normal gait. He had good grip strength and upper extremity muscle strength, slightly reduced flexion of his knees bilaterally, and mildly reduced ranges of motion of his hips bilaterally. He exhibited pain in his lumbar spine on leaning to the right; moderate to severe limitations in flexing and rotating his neck; good lower extremity muscle strength on the right; and fair lower extremity muscle strength on the left, with the notation that he has a dropped foot on the left. (R. 187-88) After examination, the doctor diagnosed Wellenstein with "Osteoarthritis in the back, left

shoulder, right elbow and right foot from a previous motorcycle accident," and "Obsessive compulsive disorder and attention deficit disorder with difficulty concentrating and depression." (R. 186)

On December 19, 2004, Jan Hunter, D.O. reviewed the record and completed a Physical Residual Functional Capacity Assessment form (R. 169-76) He opined Wellenstein would be able to lift up to twenty pounds occasionally and ten pounds frequently, and sit, stand and/or walk for about six hours in an eight-hour workday. He found Wellenstein to have no limitations in his ability to push/pull, and indicated he could perform all postural activities occasionally. (*Id.*) Dr. Hunter found Wellenstein's allegations of significant, ongoing pain not to be entirely credible, noting Wellenstein had failed to seek treatment for his alleged pain syndrome and he took only over-the-counter medications for pain. (R. 178) He further noted Wellenstein's "physical examination findings were minimal and gait was normal." (*Id.*)

On February 8, 2005, John A. May, M.D. reviewed the record and concurred in Dr. Hunter's assessment. (R. 176; *see* R. 177)

Regarding Wellenstein's mental health, John F. Tedesco, Ph.D. reviewed the record on December 29, 2004, and completed a Mental Residual Functional Capacity Assessment form (R. 150-54), and a Psychiatric Review Technique form (R. 155-68) He found Wellenstein suffers from ADHD, depression/dysthymia, and obsessive-compulsive disorder, that likely would cause him mild limitation in his activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. He found Wellenstein had experienced no extended episodes of decompensation. (R. 155-66)

Dr. Tedesco opined Wellenstein would be moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without

interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. He otherwise found Wellenstein to have no work-related limitations in terms of his mental functional capacity. (R. 150-53) Dr. Tedesco found the record did not support the existence of marked functional impairments, noting that although Wellenstein indicated he had suffered from depression throughout his life, he nevertheless had been able to work at substantial gainful activity levels. (R. 152) He also noted none of Wellenstein's treating sources had made note of marked functional impairments or serious symptomatology, and Wellenstein had never required hospitalization for his symptoms. (*Id.*)

On March 8, 2005, Wellenstein underwent a neuropsychological assessment by John E. Meyers, PsyD. (R. 282-89) Dr. Meyers administered a battery of tests to Wellenstein, the results of which Dr. Meyers indicated were "an adequate representation of his current cognitive functioning level on the tasks given." (R. 283) In addition, Wellenstein completed two self-report questionnaires of his psychological functioning, one addressing his general functioning over time (the MMPI-2), and the other addressing his psychological functioning during the preceding seven days (the SCL90-R). Considering Wellenstein's test results and the results of these self-report questionnaires, Dr. Meyer reached the following conclusions:

> [Wellenstein's] Attention and Working Memory was average. Tasks of Processing Speed and Mental Flexibility were average. Verbal Reasoning skills were average. His Visual Reasoning skills were low average. His Verbal Memory skills were average. His Non-Dominant Hand Motor and Sensory skills were average.
>
> Everyday functional memory skills are dependent on a multitude of cognitive functions not limited to simple new learning. Given the current scores, his functional memory was average. Functional activities including daily living activities,

self care and daily decision making including cooking, home care and basic activities of daily living function was average. Appropriate social activities and interaction is a complex set of behaviors that can be influenced by psychological and cognitive factors. His social awareness was average.

The psychological profile suggests chronic marginal schizoid adjustment. He may be angry and resentful but has difficulty modulating his emotions. His behavior may be unpredictable and frequent social and legal difficulties are possible. He may have a thought disorder as well . . . including bizarre thinking and difficulty organizing his thinking.

Remembering locations and work-like procedures was average. Understanding and remembering very short and simple instructions was average. Understanding and remembering detailed instructions was a little below average, but still within normal limits. Carrying-out detailed instructions was average. Maintaining attention and concentration for extended periods of time was average. Performing activities within a schedule and maintaining regular attendance and punctuality within customary tolerances was a little below average, but still within normal limits. Sustaining an ordinary routine without special supervision was average. Working on coordination with or in proximity to others without being distracted was average. Making simple work-related decisions was average[.] Ability to complete a workweek without undue interruptions from psychologically based symptoms was average. Performing at a consistent pace without an unreasonable number and length of rest periods due to psychological/cognitive difficulties was average. Interacting appropriately with the general public was a little below average, but still within normal limits. Asking simple questions or requesting assistance was average. Accepting instructions and responding appropriately to criticism from supervisors was average. Getting along with coworkers and peers without distracting them or exhibiting behavioral extremes was average. Maintaining socially appropriate behavior and adhering to basic standards of behavior was average. Responding appropriately to changes in the work setting was average. Ability to manage own schedule was a little below average, but still within normal limits. The ability to manage

one's own finances involves a multitude of cognitive tasks. His ability to manage his own finances was average.

Vocational Summary: Individuals who score at this level of overall performance on the neuropsychological battery are generally able to perform office type work, including clerical, sales, managerial, skilled work or semi-skilled or unskilled vocations are also within this vocational range. At this level of performance, any area of vocational interest could be achieved. Selection of a vocation is therefore a personal preference depending on interests and any physical limitations. Academic pursuits, vocational technical training or on-the-job training will probably be successful.

The speed of processing information (visual or verbal) was adequate; this suggests he would be expected to be able to maintain adequate speed and pace of response. Unless physical limitations are present, he would be able to meet general industrial demands. If additional formal classroom training is needed, no particular difficulty would be expected in his ability to maintain cognitive pace and duration of concentration. Language skills were generally intact. He would be generally able to follow normal conversations, instructions and language based procedures. Given the neuropsychological profile, he appears to be about average in his processing of visual information. He is able to use visual cues from the environment to alter his behavior. Vocations that are visual in nature could be considered for vocational planning. His ability to process auditory information was good. This suggests at least adequate ability to process multiple auditory inputs. No particular difficulty would be expected with group conversations or in other social interactions. He shows adequate general learning ability. He would be able to learn verbal procedures in a generally normal fashion. Vocations that require verbal training could be considered when making vocational choices. Given the profile of results his ability to manage his own schedule, and perform everyday functional memory type tasks was adequate (i.e. remembering appointments and tasks that need to be done). This suggests that in a vocational setting, he would be expected to be able to recall procedures, and to perform future events adequately. The use of a calendar or memory book may be

helpful. Dominant hand skills that require sensory and motor persistence were within functional limits. This indicates no general difficulty for tasks that require fine motor control and sensory feedback. Non-dominant hand skills that require sensory and motor persistence were within normal limits. This indicates no general difficulty for tasks that require fine motor control and sensory feedback.

Based on the profile of neuropsychological data this patient shows a pattern of scores that generally falls within normal limits. There is no indication of cognitive impairment. The pattern of scores is most consistent with individuals that have delusional characteristics which may be the basis of his unusual cognitive complaints and unusual behavioral presentation[.] The presence of thought disorder charac-teristics [is] indicated by both the psychological and cognitive portion of the evaluation. He may wish to consult with his treating physician to help organize his thinking.

(R. 287-88)

On April 1, 2005, Myrna C. Tashner, Ed.D. reviewed the record and concurred in Dr. Tedesco's findings. (R. 153, 154) It is not apparent from the record whether this evaluator had the results of the neuropsychological assessment available to her.

### c.    *Vocational expert's testimony*

The ALJ asked the VE to consider a younger worker with a high school education and past work as a commercial or institutional cleaner, who is subject to the following limitations:

First question I have is for light, unskilled work, if he could occasionally lift or carry 20 pounds[,] frequently[] 10 pounds, could stand, or walk, or sit for six hours in an eight hour day and could occasionally do postural activities. Then, from a mental standpoint, needs to have routine, repetitive work that does not require him to set goals, deal with job changes, or have extended concentration. And this is work that could be done under ordinary supervision, but I would say that the social interaction should be only brief or superficial

19

with coworkers and the general public, and would not exceed
frequent or constant during the workday. With that functional
capacity, could he do this past work or could you identify any
other type of work?

(R. 326-27)  The VE indicated the hypothetical individual could perform a large number
of different jobs.  (R. 327-29)

The ALJ next asked the VE to consider a second hypothetical questions:

Now, secondly, we have a check-list from Dr. Brin[c]k
in which he indicates that the Claimant has continual episodes
of de-compensation and extreme restrictions in [activities of
daily living], social [interaction], and concentration.  Would
that at the extreme level, obviously, preclude all employment?

(R. 329)  The VE responded that it would.  (R. 330)  The ALJ then asked whether, if
Wellenstein's testimony was credible, he could perform any type of work.  The VE
responded, "No."  (*Id*.)


### d.    *The ALJ's decision*

The ALJ determined that Wellenstein has the following severe impairments:
attention deficit hyperactivity disorder, depression, obsessive compulsive disorder,
somatoform disorder, and chronic pain from a motorcycle accident in 1979.  (R. 18.)
However, Wellenstein does not have an impairment or combination of impairments that
meets the Listings.  (*Id*.)

The ALJ found Wellenstein is self-employed and runs his own business.  His
activities include preparing simple meals, doing laundry, grocery shopping, driving a car,
playing with his computer, talking with friends on the telephone, and attending church
activities at least three times per week.  (R. 19)

The ALJ found Wellenstein has the following residual functional capacity:

After careful consideration of the entire record, the
undersigned finds that the claimant has the residual functional
capacity to lift 20 pounds occasionally and 10 pounds
frequently; he can sit, stand and walk 6 out of 8 hours; and he

can occasionally perform postural activities (i.e., climbing, balancing, stooping, kneeling, crouching and crawling). From a mental standpoint, the claimant needs to have routine, repetitive work that does not require him to set goals, deal with job changes or have extended concentration, and work that can be done under ordinary supervision; and social interaction should be brief and superficial with the general public and co-workers.

(*Id.*)  The ALJ concluded Wellenstein's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 23)  The ALJ further concluded that based on the entire record, the evidence "does not substantiate the claimant's allegations with respect to the extent of his symptoms and limitations and does not support a finding of disability." (R. 30)

The ALJ did not give significant weight to Dr. Brinck's assessment of April 4, 2006.  The ALJ noted Dr. Brinck checked "extreme" limitations in every area of functioning, even though Wellenstein "has never been hospitalized, he runs his own business, he can drive 30 miles to and from work, and he can be self-employed and meet with contractors and employees." (R. 30-31)  The ALJ concluded that Dr. Brinck "clearly does not understand" the term "extreme." (R. 31)  He also decided that Dr. Brinck's assessment was not consistent with Wellenstein's reported GAF of 60.  (*Id.*)  The ALJ noted that although Dr. Brinck opined Wellenstein was unable to work, a determination of whether a claimant is "disabled" or "unable to work" under the Act is reserved to the Commissioner, and the opinions of treating sources on this subject are "never entitled to controlling weight or special significance." (R. 31)

With regard to the checklist report by Diane Sorensen, Wellenstein's therapist, the ALJ determined it was not entitled to significant weight because it was not supported by the evidence and because Sorensen was not an acceptable medical source pursuant to 20 CFR 404.1513 and 20 CFR 416.913.  (R. 31)

The ALJ relied on the neuropsychological evaluation prepared by Dr. Meyers on March 8, 2005, which showed "all domains were average, except for possible schizoid adjustment on psychological profile, with no indication of cognitive impairment and an overall performance indicating the capability of performing even skilled work and 'any area of vocational interest.'" (*Id.*) The ALJ also determined the record "does not indicate any physical impairments that would preclude the performance of all types of work activity." (*Id.*)

The ALJ concluded that Wellenstein is unable to perform any past relevant work. (*Id*). However, he also concluded "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 32) These jobs include light housekeeper/cleaner, product assembler, and hand packager, as well as 80 to 85 percent of the full range of light work. (R. 32-33) Based on this conclusion, the ALJ found Wellenstein is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and he therefore is not disabled. (R. 33)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only

when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if

it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting

*Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third

parties and treating and examining physicians relating to such matters as:

1)     the claimant's daily activities;
2)     the duration, frequency and intensity of the pain;
3)     precipitating and aggravating factors;
4)     dosage, effectiveness and side effects of medication;
5)     functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

Wellenstein argues the ALJ erred in failing to give controlling weight to Dr. Brinck's opinion that he is markedly limited in his ability to work, to consider therapist Diane Sorensen's opinions, to develop the record fully and fairly regarding his physical and mental limitations, and to make a proper credibility analysis under *Polaski*. (Doc. No. 10)

In his argument that the ALJ failed to give controlling weight to Dr. Brinck's assessment, Wellenstein repeatedly refers to Dr. Brinck's ongoing relationship with him as a treating physician. The record indicates, however, that although Dr. Brinck super-vised the therapists and saw Wellenstein for medication management, he did not provide any psychotherapy himself and he spent little time with Wellenstein from which he could derive the opinions set forth in his medical source statement.

"A treating physician's opinion is normally entitled to great weight. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)." *Rankin v. Apfel*, 195 F.3d 427, 429 (8th Cir. 1999). But where the physician's conclusions are at odds with the weight of the objective evidence, including the claimant's daily activities and therapy records, the physician's

opinion properly may not be afforded the same degree of deference.  *See id.* (citing *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999)).  Here, Dr. Brinck's indication that Wellenstein suffered ongoing episodes of decompensation, and would be markedly limited in almost every area of functioning, is inconsistent with the treatment records and other evidence of record.  The court finds the ALJ did not err in the weight given to Dr. Brinck's assessment, which conflicts with the other evidence in the record as a whole.

Wellenstein argues Dr. Brinck's opinions were "consistent with the opinions expressed by Diane Sorenson [sic]."  Doc. No. 10, p. 12.  However, the record does not indicate that Sorenson had any substantial basis for the opinions she expressed.  Her treatment notes do not contain entries indicating Wellenstein was suffering from severe, disabling symptoms, nor does she appear to have had a long enough treating relationship with Wellenstein to substantiate her conclusions.

The treatment records from Siouxland Mental Health, when viewed as a whole, depict an individual who is somewhat out of touch with reality; over-dramatizes life situations and his physical complaints; makes changes to his medication regimen on his own, without consulting his treating sources; and is resistant to treatment recommendations by his therapists and treating sources.  Despite what appears to be a long history of similar symptoms, Wellenstein was able to work and support himself prior to his alleged disability onset date of January 1, 2003.  Wellenstein's condition has changed little, if at all, since his alleged disability onset date.  He continues to run his business and perform a full range of daily activities.  The objective evidence of record simply does not contain evidence that Wellenstein is disabled from either a mental or physical standpoint, or from any combination of impairments.

However, the record also contains substantial subjective evidence consisting of Wellenstein's statements and those of his wife regarding his symptoms, side effects of medications, and physical and mental limitations.  Wellenstein argues the ALJ failed to conduct a proper credibility analysis pursuant to *Polaski*.  The ALJ conducted a thorough

review of Wellenstein's subjective complaints, *see* R. 21-23, and Wellenstein's medical history, *see* R. 23-31. However, the ALJ failed to articulate inconsistencies between the record and Wellenstein's subjective complaints to support his finding that Wellenstein's complaints were not fully credible. The ALJ also appears not to have considered statements from Wellenstein's wife regarding his daily limitations. The VE testified that if Wellenstein's subjective complaints were credible, Wellenstein would be unable to perform any type of work. Because a full and complete credibility analysis is lacking, the court is unable to find that the record "overwhelmingly supports" an immediate finding of disability. *See Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000). As a result, the court finds it would be appropriate to remand the case for further proceedings, including further development of the record regarding Wellenstein's work-related mental and physical limitations.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[1] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within 14 days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed, and this case be remanded for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**DATED** this 26th day of January, 2010.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[1]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.